**Law Office of Barry W. Rorex, PLC**
177 N. Church Ave., Suite 1100
Tucson, Arizona 85701
(520) 495-7596
(520) 838-8061(fax)
Michael Harnden Bar No. AZ029474
mike@brorexlaw.com
Counsel for the Arizona Defendants
*Pro hac vice* pending

**Justice Law Center**
1100 S. 10th St.
Las Vegas, NV 89104
(702) 731-0000
Bret Whipple Bar No. NV6168
admin@justice-law-center.com
Counsel for the Arizona Defendants

## United States District Court
### District of Nevada

| | |
|---|---|
| Andre Wilson, an individual, | Case No.: 2:15-cv-02198-GMN-CWH |
| Plaintiff | **Defendants Web Express LLC and Charles Rodrick's Special Motion to Dismiss (Anti-SLAPP pursuant to Nev. Rev. Stat. § 41.660)** |
| vs. | |
| Web.com Group, Inc., *et al*, | **(Oral argument requested)** |
| Defendants | Hon. Gloria M. Navarro |
| | Assigned to Magistrate Judge Hon. Carl W. Hoffman |

Defendants Web Express, LLC and Charles Rodrick (hereafter, collectively, the "Arizona Defendants"), by and through the undersigned counsel, and pursuant to Nevada Revised Statute § 41.660, move to dismiss Plaintiff's Amended Complaint against them because the claims against the Arizona Defendants are based on protected free speech covered by Nevada's anti-SLAPP statute and Plaintiff cannot succeed on any of his claims. This motion is supported by the incorporated Memorandum of Points and Authorities.

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    Background

Plaintiff's lawsuit, at its core, is more a complaint about the basic nature of the internet rather than any action or behavior by the Arizona Defendants.  The internet facilitates the rapid dissemination of information of all types, which not only allows otherwise geologically-disparate people and groups to communicate and pursue a joint objective, it also has the capacity to amplify the potential impact of information that may have otherwise had (without the public's easy ability to access it) minimal effect.  A recent example of this phenomena occurred this past summer when a Minnesota dentist posted a picture of his recent big game hunt to social media.[1]  The picture showing the dead lion was shared far beyond the dentist's friends and acquaintances, a spread that was unintended by the dentist and, at least initially, unknown to him.  The rapid spread of the information led to the dentist (and his hunt) becoming national (even international) news.  *Id.*  Internet outrage at the dentist for participating in the hunt led to numerous harmful reviews of his business by people who had never used his services, governmental investigations, physical protests at the place of business, and even threats against him personally.  *See Id.*  As a result of the reaction to the picture, the business was forced to take down its website. *Id.*  The dentist had to shutter his practice and was forced into hiding to avoid further harassment and threats.  *See Id.*

The picture is a piece of information whose potential harm to the dentist, in the pre-internet era, was likely vanishingly small.  A person would have had to personally visit a location where the dentist displayed the picture.  If that person had a strong moral objection to the dentist participating in a big game hunt, they may have confronted the dentist directly to express that opinion and/or, potentially, shared their condemnation of the dentist with those in their friend or acquaintance group.  That would have ended of the matter, with the extent of harm to the dentist being limited to negligible reputational impact and/or the loss of a few patient-client prospects.

---

[1] *See* http://www.cnn.com/2015/07/30/us/walter-palmer-whereabouts/index.html

In the instant matter, like the dentist, Plaintiff engaged in conduct in the past which, due to the nature of his prior actions, could potentially harm his reputation should someone learn of that behavior.  Also like the dentist, there is proof of Plaintiff's behavior on the internet identifying Plaintiff and his prior misconduct, and this information is readily accessible to anyone with an internet connection.  Through this lawsuit, Plaintiff seeks, *inter alia*, to remove that information from the internet.

In many cases, due to an inconsistent patchwork of internet and privacy laws across the globe[2], a person wishing to remove unfavorable information from the internet has no legal ability or right to do so.  Even in those cases where there is an enforceable law and jurisdiction over the person responsible for the data transmission, it can still be, practically-speaking, impossible to remove the information due to the inherently distributed and redundant nature of the internet.

Unlike the dentist, who intentionally put the picture leading the outrage onto the internet via his personal social media account, Plaintiff did not choose to place the information showing his past misdeeds on the internet.  Rather, Plaintiff's information was contained in public records related to his conviction for criminal sexual contact in New Jersey. The website containing Plaintiff's records (as referenced in the Amended Complaint) is part of a private archive of public records of convictions with over 750,000 different entries.  A copy of the website referenced in the Amended Complaint that serves as the basis Plaintiff's claims (hereafter, the "Website") is attached hereto as Exhibit "A"; *see also*, Defendant Rodrick's Affidavit in support of this Motion, attached hereto as Exhibit "B", ¶¶ 6, 7, 11. Neither Arizona Defendant had any role in the creation or development of the database containing the archive or any record contained therein—including Plaintiff's.  Exhibit B, ¶¶ 8, 9, 10.  The archive was compiled from various public and private public record sources by

---

[2] *See*, e.g., *Garcia v. Google, Inc.*, 786 F.3d 733, 745 (9th Cir. 2015) (dismissing an actor's lawsuit seeking to force Google to remove all online copies of the film Innocence of Muslims even though the actor never intended to participate in the film and was receiving death threats because of her appearance in the film; the Circuit Court stated that although the Court of Justice for the European Union had recently affirmed a "right to be forgotten" by demanding the removal of links to information on the internet, such a right "is not recognized in the United States.").

3

a third party.  *Id.* at ¶¶ 6, 7, 10.  Unknown to the Arizona Defendants at the time, information from the public records of Plaintiff's conviction was included in the database.  Exhibit A; Exhibit B at ¶¶ 12, 15, 17, 19.

At some point, Plaintiff sought to have his conviction record expunged in New Jersey. New Jersey provides a statutorily-governed process allowing certain citizens with records of conviction, depending on a number of factors, to have that record expunged, as defined and with the effects set forth in New Jersey law.  *See* N.J. Stat. § 2C:52 *et seq.*  He completed that process in 2012.  Plaintiff has taken the position in this lawsuit that, due to the New Jersey expungement, the information contained in the public records of his conviction now allegedly constitute false statements and the Arizona Defendants are liable for harm Plaintiff has suffered due to their publication of the contents of those public records.  Plaintiff not only misunderstands New Jersey law on this issue, his position ignores not only substantial legal precedent, but also federal law.

## II.   Legal Standards

### A.   Nevada's anti-SLAPP Statute (Nev. Rev. Stat. § 41.635 *et seq.*)

Courts and legislatures across the country have widely recognized the rising prevalence of the SLAPP (Strategic Lawsuit Against Public Participation) and the associated harms to society's Constitutional rights and the judicial system itself.  "A SLAPP suit is one in which the plaintiff's alleged injury results from petitioning or free speech activities by a defendant that are protected by the federal or state constitutions.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003).  One court described the problem created by SLAPP suits as follows:

> The conceptual thread that binds them is that they are suits without substantial merit that are brought by private interests to stop citizens from exercising their political rights or to punish them for having done so.

> SLAPP suits function by forcing the target into the judicial arena where the SLAPP filer foists upon the target the expenses of a defense. The longer the litigation can be stretched out, the more

4

> litigation that can be churned, the greater the expense that is inflicted and the closer the SLAPP filer moves to success. The purpose of such gamesmanship ranges from simple retribution for past activism to discouraging future activism. Needless to say, an ultimate disposition in favor of the target often amounts merely to a pyrrhic victory. Those who lack the financial resources and emotional stamina to play out the "game" face the difficult choice of defaulting despite meritorious defenses or being brought to their knees to settle. The ripple effect of such suits in our society is enormous. Persons who have been outspoken on issues of public importance targeted in such suits or who have witnessed such suits will often choose in the future to stay silent. Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined.

*Gordon v. Marrone*, 590 N.Y.S.2d 649, 656 (N.Y. Sup. Ct. 1992) *aff'd*, 616 N.Y.S.2d 98 (N.Y. App. Div. 1994) (internal citations and quotations omitted).

The rise of these lawsuits has led to numerous states to create laws specifically addressing this type of harmful and meritless action: "Nevada's anti-SLAPP statute seeks to promote and protect a citizen's exercise of his or her constitutional rights." *John v. Douglas Cty. Sch. Dist.*, 219 P.3d 1276, 1283 (Nev. 2009). Anti-SLAPP statutes are "enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Vess*, 317 F.3d at 1109. When evaluating the Nevada anti-SLAPP statute, Nevada courts "consider California caselaw because California's anti-SLAPP statute is similar in purpose and language to Nevada's anti-SLAPP statute." *John*, 219 P.3d at 1283.

The Nevada anti-SLAPP statute protects any good faith communication in furtherance of the right to free speech in direct connection with an issue of public concern. Nev. Rev. Stat. § 41.637. A communication is made in "good faith" when it is truthful or is made without knowledge of its falsehood. *Id.* While the original form of Nevada's statute limited anti-SLAPP motions to statements related to petitioning the government, amendments have broadened its scope and include "[c]ommunication made in direct connection with an issue of public interest in a place open to the public or in a public forum".

1  *Id.*; *see also* 2015 Nev. Laws Ch. 428 (approved June 8, 2015) (legislative history from most

2  recent amendment

3          Further, one of the effects of the Nevada statute is that any person exercising his or

4  free right to free speech on a matter of public concern "is <u>immune from any civil action</u> for

5  claims based upon the communication".  Nev. Rev. Stat. § 41.650 (emphasis added).

6          **B.     Anti-SLAPP Special Motion to Dismiss (Nev. Rev. Stat. § 41.660)**

7          Nevada's anti-SLAPP statute extends well beyond serving as an affirmative defense.

8  In addition to serving as a shield by providing immunity, the statute also provided a SLAPP

9  defendant a sword by creating its own special motion to dismiss procedure to effectuate

10  quickly disposing of those claims that have the practical effect of infringing on a defendant's

11  free speech rights.   "The purpose of the special motion to dismiss is to filter out

12  'unmeritorious claims in an effort to protect citizens from costly retaliatory lawsuits arising

13  from their right to free speech under both the Nevada and Federal Constitutions.'"  *Rebel*

14  *Communications, LLC v. Virgin Mary Water Dist.*, No. 2:10–CV–0513–LRH–PAL, 2012 WL

15  934301, *2 (D. Nev. March 20, 2012) (citing *John*, 219 P.3d at 1282).

16          Nevada's statute, even when compared to similar statutes in other states, contains

17  serious "teeth" in order to discourage SLAPP actions.  A defendant who succeeds on an anti-

18  SLAPP motion is entitled to a <u>mandatory</u> award of all attorneys' fees and costs against the

19  plaintiff bringing the action.  Nev. Rev. Stat. § 41.670(1)(a).  In addition to the mandatory

20  award, the court may use discretion to award the prevailing defendant up to an additional

21  $10,000 for being forced to defend the suit.  Nev. Rev. Stat. § 41.670(1)(b).  Beyond even the

22  mandatory and discretionary monetary awards, the statute even creates a private right of

23  action for the prevailing defendant to bring a <u>separate</u> lawsuit where it can be awarded

24  compensatory and punitive damages as well as the attorneys' fees and costs of that additional

25  suit.  Nev. Rev. Stat. § 41.670(1)(c).

26          In order to succeed, a defendant bringing an anti-SLAPP motion must "make a

27  threshold showing that it made good faith communications in furtherance" of its rights to

6

1 free speech.  *See Rebel Communications*, 2012 WL 934301 at *2.  The moving defendant "need

2 not show that the plaintiff's suit was brought with the intention to chill the defendant's

3 speech; the plaintiff's 'intentions are ultimately beside the point.'"  *Vess*, 317 F.3d at 1110

4 (citation omitted).  Nor is the moving defendant required to establish that any speech was

5 actually chilled.  *Id.*

6       The defendant need only make a prima facie showing that the plaintiff's lawsuit "arises

7 from" the defendant's conduct "in furtherance of" the defendant's exercise of free speech.

8 *Williams v. Stitt*, No. C 14-00760 LB, 2014 WL 3421122, *4 (N.D. Cal. July 14, 2014).  Under

9 the anti-SLAPP statutes, "a cause of action 'arises from' conduct that it is 'based on.'"

10 *Graham-Sult v. Clainos*, 756 F.3d 724, 735 (9th Cir. 2014).  The court must first identify what

11 activities form the basis for each of the plaintiff's causes of action set forth in the complaint.

12 *Id.*  The next step in the analysis is "to ask whether those activities are 'protected,' bringing

13 the cause of action within the scope of the anti-SLAPP statute."  *Id.*

14       Once the defendant has made these showings, the burden of production shifts to the

15 nonmoving party.  *Vess*, 317 F.3d at 1110.

16       When the Nevada anti-SLAPP statute was originally enacted, the court was required

17 to evaluate it as a motion for summary judgment—albeit one filed near the inception of the

18 case rather than after discovery had commenced.  *See* 1997 Nev. Laws Ch. 387 (approved July

19 11, 1997).  The statute was again amended in 2013, which not only substantially expanded the

20 reach and remedies of the statute, but also significantly altered the process for evaluating the

21 special motion to dismiss.  Instead of treating the motion as one for summary judgment, the

22 amendments created the current two-step process for deciding the motions.  *See* 2013 Nev.

23 Laws Ch. 286 (approved May 27, 2013).  Under the amended statute, the first evaluation was

24 whether the moving defendant's claim was based on a good faith communication in

25 furtherance of free speech.  *Id.*  The movant's burden is only a preponderance of the evidence.

26 *Id.*  If the court found the moving party had met its burden, the amended statute then shifted

27 the burden to the nonmoving plaintiff, who had to prove, <u>by clear and convincing evidence,</u>

that the plaintiff had a "<u>probability of prevailing</u> on the claim". *Id.* (emphasis added). Both of those requirements are higher than those imposed on a plaintiff facing a summary judgment motion. *See Las Vegas Tribe of Paiute Indians v. Phebus*, 5 F. Supp. 3d 1221, 1227 (D. Nev. 2014) ("To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that 'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"); *see also Wood v. Safeway, Inc.*, 121 P.3d 1026, 1031 (Nev. 2005) (adopting federal summary judgment standard).

The statute was again amended just this past summer. 2015 Nev. Laws Ch. 428 (approved June 8, 2015). This amendment again changed the nonmoving plaintiff's burden to survive a special motion to dismiss. The amendment replaced the "clear and convincing" verbiage and declared that the intent of the amendment was to make the plaintiff's burden the same as that faced by a California plaintiff under that state's anti-SLAPP statute. *Id.* Although that burden is not explicitly defined, it falls somewhere in below the "clear and convincing/high probability" standard and above the "summary judgment/triable issue of fact" standard. *See Makaeff v. Trump University, LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (after an anti-SLAPP movant has met its burden, the California statute shifts the burden back to the plaintiff and requires a plaintiff "to show a 'reasonable probability' that he will prevail, rather than merely a triable issue of fact") (Kozinski, CJ) (concurring opinion).[3]

For the second part of the test, the plaintiff must first burden, as a matter of law, that no protection exists which could classify the defendant's conduct as protected or otherwise privileged speech. *Williams*, 2014 WL 3421122 at *4 ("The plaintiff also must present evidence to overcome any privilege or defense to the claim that has been raised."). Plaintiff's second burden is to demonstrate that the complaint is legally sufficient and supported by a

---

[3] Despite the 2013 and 2015 amendments changing the burdens, courts have continued to erroneously evaluate special motions to dismiss under the summary judgment standard rather than the lower defendant's burden and higher plaintiff's burdens demanded by the clear text of the statute in each of its amended forms. *See*, e.g., *Davis v. Parks*, No. 61150, 2014 WL 1677659, *4 (Nev. Apr. 23, 2014) (unpublished opinion); *Lawrence v. Krahne*, No. 66595, 2015 WL 5545555, *1 (Nev. App. Sept. 16, 2015) (unpublished opinion).

1   sufficient showing of facts to establish that the complaint has a "reasonable probability" of

2   success.  *Id.*  When responding to a special motion to dismiss, "the nonmoving party cannot

3   overcome the special motion to dismiss 'on the gossamer threads of whimsy, speculation and

4   conjecture'".  *John*, 219 P.3d at 1281.  Nor may a plaintiff respond to a special motion to

5   dismiss merely by "present[ing] a narrative disagreement with the moving party"—they are

6   required to provide evidence in support of their burden.  *Id.* at 1287.

7               C.      The public's right to public records

8         Throughout the Ninth Circuit (and across the county[4]), it is well-settled law that

9   members of the public have a presumed right to access court proceedings and the public

10  records resulting therefrom.  *CBS, Inc. v. U.S. Dist. Court for Cent. Dist. of California*, 765 F.2d

11  823, 825 (9th Cir. 1985); *Oregonian Pub. Co. v. U.S. Dist. Court for Dist. of Oregon*, 920 F.2d 1462,

12  1465 (9th Cir. 1990); *United States v. Rivera*, 682 F.3d 1223, 1228 (9th Cir. 2012); *Courthouse*

13  *News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014).

14        The Ninth Circuit, in particular, prides itself on "champion[ing] public access,

15  observing that in this circuit, we start with a strong presumption in favor of access to court

16  records", even when those records have been sealed via court order.  *Perry v. City & Cty. of*

17  *San Francisco*, No. 10-16696, 2011 WL 2419868, *18 (9th Cir. Apr. 27, 2011).  This right "is

18  grounded in the First Amendment and in common law and extends to documents filed in

19  pretrial proceedings as well as in the trial itself."  *CBS, Inc.*, 765 F.2d at 825 (citations omitted);

20  *see also Press-Enter. Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 510 (1984) (First

21  Amendment); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (common law).  The

22  Ninth Circuit explicitly found that there is "no principled basis for affording greater

23  confidentiality to post-trial documents and proceedings than is given to pretrial matters."

24  *CBS, Inc.*, 765 F.2d at 825.  The right of access includes findings of guilt, whether they be

25

26  ───────────────────────
    [4] *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004); *Republic of Philippines v. Westinghouse Elec. Corp.*, 949
27  F.2d 653, 659 (3d Cir. 1991); *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 176 (5th Cir. 2011), *as revised* (June 9, 2011);
    *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1177-1180 (6th Cir. 1983); *United States v. McVeigh*, 119 F.3d
    806, 811 (10th Cir. 1997).

rendered at trial or as result of the criminal defendant pleading guilty.  *Oregonian Pub. Co.*, 920 F.2d at 1465.  Note that this right of access even extends to documents regarding a criminal defendant that are sealed by court order.  *See CBS, Inc.*, 765 F.2d at 825.  "It is thus well-established that the right of access to public records and proceedings is 'necessary to the enjoyment' of the right to free speech."  *Courthouse News Serv.*, 750 F.3d at 786 (citation omitted).  It is indisputable that "[t]he general public has the same right of access as does the media."  *Courthouse News Serv.*, 750 F.3d at 788.

### D.    Fair reporting privilege

The law has long recognized a person who republishes the result of a judicial proceeding, using material available to the general public, has absolute immunity from defamation, as long as this report is "fair, accurate, and impartial."  *Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 984 P.2d 164, 166-167 (Nev. 1999) (citing *Thompson v. Powning*, 15 Nev. 195, 203 (Nev. 1880)).  This privilege extends to immunity from invasion of privacy claims as well.  *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 493 (1975).  While typically associated with the news media, this privilege applies equally to any member of the public. *Sahara Gaming*, 984 P.2d at 166.  Once truthful information is "publicly revealed" or is "in the public domain", courts cannot constitutionally restrain that information's dissemination. *Daily Mail*, 443 U.S. at 103.

### E.    Immunity under the Communications Decency Act "safe harbor"

In addition to the First Amendment and its corollaries, Congress created a special immunity from liability for internet-related entities from lawsuits related to the transmission or display of information originating from a third party.

"Section 230 of the Communications Decency Act ("CDA") immunizes providers of interactive computer services against liability arising from content created by third parties: 'No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.'"  *Kimzey v. Yelp, Inc.*, 21 F.Supp.3d 1120, 1122-1123 (W.D. Wash 2014) (citing 47 U.S.C. § 230(c)); *Fair Housing*

*Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008), *appeal filed* June 5, 2014.  Important for any analysis under the CDA are two terms:  1) a provider of an interactive computer service ("ICS") and 2) an information content provider ("ICP").  An ICS is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ."  *Levitt v. Yelp! Inc.*, C-10-1321 EMC, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011) *aff'd*, 765 F.3d 1123 (9th Cir. 2014) (citing 47 U.S.C. § 230(f)(3)).  An ICP is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet . . . ." *Id.*

While the actual definitions may seem confusing or similar, how those definitions are applied is a vital distinction:  an ICS is generally immune from any liability for publishing or transmitting any information that was provided primarily by third parties, whereas an ICP (or an ICS acting as an ICP with regard to that information) is not.  *Id.* (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) ("[Section] 230(c) provides broad immunity for publishing content provided primarily by third parties.") (brackets in original)). Section 230 marks a departure from the common law rule that allocates liability to publishers or distributors of tortious material written or prepared by others:  "[a]bsent § 230, a person who published or distributed speech over the internet could be held liable for defamation even if he or she was not the author of the defamatory text, and, indeed, at least with regard to publishers, even if unaware of the statement."  *Batzel v. Smith*, 333 F.3d 1018, 1026–1027 (9th Cir. 2003).  "Congress, however, has chosen to treat cyberspace differently."  *Id.*

If a website displays content that is created entirely by third parties, then it is only an ICS with respect to that content—and thus is immune from claims predicated on that content.  *Carafano*, 339 F.3d at 1123.  Even if an entity is determined to be an ICP, the CDA immunity extends to "<u>any</u> information provided by <u>another</u> information content provider . . . ."  *Id.* at 1125 (emphasis in original).  Additionally, the CDA bars any lawsuit that attempts to hold an ICS liable for that ICS exercising "traditional editorial functions" over information

or content provided by someone other than the ICS. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), *as amended* (Sept. 28, 2009). These "traditional" functions include "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Klayman v. Zuckerberg*, 910 F. Supp. 2d 314, 319 (D.D.C. 2012) (citing *Barnes*), *aff'd*, 753 F.3d 1354 (D.C. Cir. 2014). Even altering the content provided by a third party before publishing it does not remove immunity under the CDA, if it is done with editorial, organizational, or effectiveness concerns. *Klayman*, 910 F. Supp. 2d at 319 (citing *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

If an entity is found to have immunity under the CDA, it is immune from nearly all civil liability, including tortious interference with business relationships, invasion of privacy, and defamation. See *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1117 (W.D. Wash. 2004) (tortious interference) (unrelated holding overruled); *Carafano*, 339 F.3d at 1122 (invasion of privacy, defamation).

The Ninth Circuit has interpreted the CDA to provide a "'robust' immunity for internet service providers and websites" and has adopted "a relatively expansive definition of 'interactive computer service' and a relatively restrictive definition of 'information content provider.'" *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (citation omitted). "A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content." *Kimzey*, 21 F. Supp. 3d at 1123. A party "develops" the content displayed on a website (and the immunity therefore would not apply) only when that party has made a "material contribution" to that content. A material contribution does not consist of merely displaying the content or even "augmenting the content generally" but, rather, means being responsible for what makes the displayed content allegedly unlawful. *Roommates.com*, 521 F.3d at 1168; *Goddard*, 640 F. Supp. 2d at 1196; *accord Kruska v. Perverted Justice Found. Inc.*, CV08-0054-PHX-SMM, 2008 WL 2705377, *2 (D. Ariz. July 9, 2008) (CDA immunity "protects more than the mere repetition of data obtained from another source, but

1   extends to the provider's inherent decisions about" how it uses that information) (plaintiff

2   with sex-related conviction's claims related to internet publication of statements related to

3   that conviction dismissed as barred by the CDA safe harbor).

4   **III.   Argument**

5       **A.   Plaintiff's lawsuit is meritless, frivolous, and must be dismissed under the anti-SLAPP statute.**

6           1.   The Arizona Defendants are permitted to bring this motion in this

7               Court and did so timely.

8       This Court may properly hear an anti-SLAPP motion based on the Nevada statute

9   that seeks to dismiss Nevada state law claims.  *See Drussel v. Elko Cty. Sch. Dist.*, No. 3:12-CV-

10  00551-HDM, 2013 WL 3353531, *5 (D. Nev. July 2, 2013); *see also Verizon Delaware, Inc. v.

11  Covad Commc'n Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004).   Any anti-SLAPP motion must be

12  filed within 60 days of the filing of the most recently amended complaint.  *Randazza v. Cox*,

13  2:12–cv–2040–JAD–PAL, 2015 WL 1292273, *1 (D. Nev. March 23, 2015).   Plaintiff filed

14  his Amended Complaint on October 19th, 2015.  *See* Doc. 1, p. 2.  This motion is timely.

15          2.   All of Plaintiff's causes of action arise from the publication of his

16              conviction information by the Arizona Defendants.

17      The Court need not work hard to "identify what activities form the basis for each of

18  the plaintiff's causes of action".  *Graham-Sult*, 756 F.3d at 735.  The Plaintiff is quite clear as

19  to exactly what allegedly harmed him: the Arizona Defendants' publication of and/or control

20  over the Website containing information from Plaintiff's conviction records.  Am. Compl. ¶¶

21  6, 8-11, 18-24, 26-27, 29, 33, 37-38; *see also* Exhibit A.  The Arizona Defendants' possession

22  and publication of this information on the Website are the only activities to evaluate.

23          3.   The publication of Plaintiff's public record conviction information

24              is protected speech.

                    *a.    The publication of the information is made in good faith.*

25      This element of the Arizona Defendants' burden as anti-SLAPP movants is also easily

26  established.  The information contained on the Website related to Plaintiff is true.  Plaintiff

27  was convicted of the crime shown on the Website and this is reflected in his public conviction

1    records.  A copy of a page from the expungement order Plaintiff obtained shows the date

2    and statutory basis of his conviction and is attached hereto as Exhibit "C".  As set forth in §

3    III(B)(1), *infra*, the expungement has no effect on the truth of the conviction records.  Even

4    if that information were not true, Plaintiff has made no allegation nor presented any evidence

5    that could establish either Arizona Defendant was aware of that falsehood when the

6    information was published.  The communication is in good faith.

7                    b.        *The communication was made in a "place open to the public."*

8        The Amended Complaint contains allegations (which the Arizona Defendants do not

9    dispute) sufficient to establish this element of the initial anti-SLAPP burden.    The

10   complained-of publications occurred on a public website.  *See* Am. Compl., ¶ 23-24.  Plaintiff

11   further alleged the Website was easily reachable by a member of the public.  *Id.* at ¶ 27.  Any

12   web site accessible to the public constitutes a public forum for the purposes of an anti-SLAPP

13   motion, even if the controller of that website has the ability to restrict, edit, delete, or prohibit

14   information on that site.  *Piping Rock Partners, Inc. v. David Lerner Associates, Inc.*, 946 F. Supp.

15   2d 957, 975 (N.D. Cal. 2013) *aff'd*, 609 F. App'x 497 (9th Cir. 2015).

16       The communications that serve as the basis for Plaintiff's lawsuit were made in a

17   "place open to the public."

18                    c.        *The Arizona Defendants' actions serving as the basis of Plaintiff's*

19                              *claim constitute protected speech or are otherwise immune from suit.*

20       As set forth in § II(C)-(E), *supra*, the Arizona Defendants' actions were in furtherance

21   of free speech activities protected by the First Amendment and by several other privileges

22   and immunities.

23       Court records, including conviction records, constitute "public records".  As public

24   records, members of the public have both a First Amendment and federal common law right

25   to access and obtain them.  *Oregonian Pub. Co.*, 920 F.2d at 1465.  Further, the First

26   Amendment protects the dissemination of public record information.  *Daily Mail*, 443 U.S. at

27   103.  In compiling the database underlying the Website, the Arizona Defendants obtained

Plaintiff's public conviction record information and published that same information on the Website. Both of these activities clearly are protected.

The Constitution and federal common law protect the right for a U.S. citizen to report on or summarize judicial proceedings and court records as long as they do so accurately. *Sahara Gaming*, 984 P.2d at 166-167. The Website's information related to Plaintiff came directly from court records, and no alterations or exaggerations were made. The republication of the information is a protected activity.

The CDA safe harbor provides immunity [5] to any website for transmitting or displaying information when that information originated from a third party. 47 U.S.C. § 230(c). All of the information contained in the database underlying the Website was obtained by third-party Souhrada who himself obtained it from other third-party record-aggregating services. Exhibit B, ¶ 10. The Arizona Defendants did not "create", "develop", or "materially contribute to" the information about Plaintiff found on the Website—it was all found in the records obtained from the various third parties. As such, with respect to the information contained on the Website, the Arizona Defendants are an interactive computer service and § 230 of the CDA immunizes them from suit. A plaintiff facing an anti-SLAPP motion who cannot overcome the immunity provided by the CDA cannot meet its burden in an anti-SLAPP analysis to establish a probability of success on the merits of its claim. *Batzel*, 333 F.3d at 1026-1036.

> d.  *As all of the information at issue is conviction-related and contained in public records, that information is of interest or concern to the public.*

In the United States, information and records related to most aspects of the criminal justice system are indisputability an area of public concern. *Cox Broadcasting*, 420 U.S. at 492 ("The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of

---

[5] The exceptions to CDA safe harbor immunity are few, largely involve criminal or intellectual property considerations, and inapplicable to any of Plaintiff's claims.

government.").  In addition to (or apart from) the criminal justice context, <u>any</u> information put into any public record relates to, in and of itself, an issue of public concern:

> By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media.

*Id.* at 495.

While the passage of time can play a factor in determining whether a previous issue of public concern remains a legitimate issue of concern in the context of an invasion of privacy claim, it is irrelevant in an evaluation of whether the public maintains a First Amendment interest in court records.  *Montesano v. Donrey Media Grp.*, 668 P.2d 1081, 1088 (Nev. 1983) (citing *Cox Broadcasting*).  The public's continuing First Amendment interest in criminal records remains a legitimate concern even when a convict "since release, has returned to the private, lawful and unexciting life led by the great bulk of the community." *Id.* at 1086.  The public's First Amendment interest in court records "overshadows" even a state's "strong interest" in criminal rehabilitation and reformation.  *Id.* at 1088.

> **B.    Plaintiff cannot show a reasonable probability he can succeed on any claim.**
>
> 1.    <u>Plaintiff's obtaining an expungement order under New Jersey law does not affect the evaluation of the Arizona Defendants' conduct nor is it helpful in meeting his burden to establish a probability of success.</u>

New Jersey enacted its expungement statute (N.J. Stat. § 2C:52-2) to aid in the rehabilitation and reformation of some first-time criminals.  *See* N.J. Stat. § 2C:52-32.  If all of the statutory requirements are met, a record of conviction can be ordered expunged, which does not actually destroy the record, but, rather, serves as an order that copies of the record be "extracted and isolated" by those agencies required to be served with the order.  *In re Kollman*, 46 A.3d 1247, 1254 (N.J. 2012).  The records themselves remain accessible to various

entities for various purposes.  *Id.*  After expungement, the convict may (in most circumstances), without consequence, answer in the negative to any question relating to the expunged criminal records.  The New Jersey statutes also state that if an order of expungement is granted, the arrest, conviction, and any proceedings related thereto shall be deemed not to have occurred for most purposes.  N.J. Stat. § 2C:52-27.  However, this does not end the analysis of Plaintiff's public criminal records as they pertain to this case.

The New Jersey Supreme Court in *G.D. v. Kenny* (15 A.3d 300 (N.J. 2011)) dealt with very similar legal issues as are present in the case presently before this Court.  The plaintiff sued for defamation and related privacy torts because the defendants had distributed flyers containing truthful references to crimes the plaintiff had, in fact, committed, but which had later been ordered expunged pursuant to the same statute utilized by the Plaintiff in the case at bar.  *Id.* at 304.  The *Kenny* defendants asserted truth as a defense, while the plaintiff countered that, due to the expungement, "his conviction—as a matter of law—is deemed not to have occurred" and referencing it was therefore a false statement.  *Id.*

The *Kenny* Court stated, even after noting the expungement statute's purpose was to provide relief to a nonrecidivist offender, that relief "does not include the wholesale rewriting of history."  *Id.* at 311.  The nature of this relief is essentially permission for the offender to misrepresent his past without consequence, in most circumstances.  *Id.* at 316.  Throughout the opinion, the court contrasted the statute's statement that the conviction is "deemed to not have occurred" with various descriptions and examples as to what the expungement could <u>not</u> do or require:  1) it does not transmute a once-true fact into a falsehood; 2) it cannot banish memories; 3) "[i]t is not intended to create an Orwellian scheme whereby previously public information—long maintained in official records—now becomes beyond the reach of public discourse on penalty of a defamation action"; 4) "it does not alter the metaphysical truth of [the conviction], nor does it impose a regime of silence on those who know the truth".  *Id.* at 315-316.  Nor does the statute require those who physically archive newspapers or magazines, judges and attorneys in possession of bound copies of court reporters, or

people with a private diary to take a razor to the physical paper that shows the existence of the now-expunged conviction. *Id.*

The Court also noted substantial limitations to the reach of the statute:

> Common sense tells us that an arrest or conviction may become general knowledge within a community and that people will not banish from their memories stored knowledge even if they become aware of an expungement order. And long before the entry of an expungement order, information about an arrest and conviction may be compiled by data aggregators and disseminated to companies interested in conducting background checks . . . Through the internet, today, information is transmitted instantaneously to countless recipients everywhere around the globe. All of the beneficial purposes of the expungement statute, and the protections it provides, will not allow a person to fully escape from his past. The expungement statute—enacted at a time when law enforcement and court documents may have been stored in the practical obscurity of a file room—now must coexist in a world where information is subject to rapid and mass dissemination.

*Id.* at 313 (internal citations omitted). The New Jersey Supreme Court, analyzing the New Jersey expungement statute, held that a party who truthfully reports the contents of an expunged conviction record has an absolute defense to any claim for defamation or false light invasion of privacy related to that information. *Id.* at 316 (defamation), 319 (false light). The court also ruled the expungement created no expectation of privacy for the plaintiff in the expunged record, defeating any claim related to public disclosure of that information. *Id.* at 320.

The court went so far as to opine that technological developments may render the expungement of criminal records meaningless because "previously released conviction information is published in databases which the Judiciary has no power to update or correct" and went on to cite to a website (not the one at issue in the lawsuit before this Court) where criminal conviction information was posted. *Id.* (emphasis added).

State courts in this Circuit have ruled similarly when faced with similar facts under expungement or record-sealing statutes, including the very state where this Court sits. *See*,

e.g., *Baliotis v. Clark Cty.*, 729 P.2d 1338, 1340 (Nev. 1986) ("The statute thus confers a substantial benefit on convicted persons who may appropriately disavow involvement with the criminal justice system. It is clear, however, that such authorized disavowals cannot erase history.  Nor can they force persons who are aware of an individual's criminal record to disregard independent facts known to them."); *Bahr v. Statesman Journal Co.*, 624 P.2d 664, 666 (Or. App. 1981) ("the statute authorizes certain persons to misrepresent their own past. It does not make that representation true.").

Clearly, the fact that Plaintiff had his conviction records expunged under the New Jersey statute lends no support whatsoever for his claims in this case and the expungement cannot serve as a basis to meet his burden to prove a probability of success on the merits. Rather, the *Kenny* decision provides further proof that each and every one of Plaintiff's claims are meritless and this action is frivolous.

If it is truly Plaintiff's position that the New Jersey expungement order serves as a governmental restriction of a citizen's First Amendment and common law rights to access public records, then Plaintiff has taken upon himself a burden much higher than even that contained in the anti-SLAPP statute.  When evaluating an attempt to restrict access, "a court cannot rubber-stamp an access restriction simply because the government says it is necessary" and "courts have a duty to conduct a thorough and searching review of any attempt to restrict public access."  *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).  No evidence exists that could substantiate the argument that a foreign state's law determining how that state would treat its own records relative to its own citizens overrides the First Amendment rights of all citizens across the country.  He cannot meet this burden, either.

2.   Defamation (First Cause of Action)

"To create liability for defamation there must be, among other things, a false and defamatory statement that was an unprivileged publication."  *State v. Eighth Judicial Dist. Court ex rel. Cty. of Clark*, 42 P.3d 233, 239 (Nev. 2002).  As shown above, the Arizona Defendants have made no false statements of any kind—that the information is contained in a public

record is an absolute defense to a claim for defamation.  Moreover, their communications regarding public information are protected by one or more Constitutional rights, privileges, or immunities.

Even if Plaintiff was able to establish any statement by the Arizona Defendants was unprotected and untrue, he still would have farther to go before his claim could have any kind of probability of success.  Because all of the information regarding Plaintiff at issue in this lawsuit inarguably originated from third parties, to find the Arizona Defendants were reckless in republishing this information on the Website, it is Plaintiff's burden "to show 'obvious reasons' to doubt the truthfulness of the original speaker, or the accuracy of his statements." *Makaeff*, 715 F.3d at 270-271 (quoting *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)).  "One who repeats what he hears from a reputable news source, with no individualized reason external to the news report to doubt its accuracy, has not acted recklessly." *Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir. 2002); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974) ("mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth.  Rather, the publisher must act with a high degree of awareness of . . . probable falsity.").

No evidence exists that either Arizona Defendant knew, at the time of publication, that the public record information was untrue or that there was any reason to doubt it. Exhibit B, ¶ 19.  If ever the United States were to designate an exemplar of a "reputable news source", one would hope the U.S. court system would be high on the list of candidates. Plaintiff has no likelihood of success on this claim.

> 3.   Wrongful Interference with Prospective Economic Advantage (Second Cause of Action)

Wrongful interference claims are subject to dismissal by an anti-SLAPP motion if the claims are based on the defendant's exercise of protected conduct or speech.  See *Salma v. Capon*, 74 Cal. Rptr. 3d 873, 888 (Cal. Ct. App. 2008).  Any plaintiff alleging a claim for wrongful interference must prove, *inter alia*, that the defendant had knowledge of the

1   plaintiff's prospective relationship and that the defendant's actions are not protected by any
2   privilege or other justification.  *See In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011)
3   (citation omitted).   "It is hornbook law that the actions complained of in a claim for
4   intentional interference with prospective advantage must be wrongful."  *Id.* at 704 (dissenting
5   opinion).

6          As set forth above, every action taken by the Arizona Defendants is protected by their
7   Constitutional rights, privileges, and/or immunities under the law—i.e., not "wrongful".
8   Moreover, Plaintiff has not (and cannot) prove the Arizona Defendants knew of his
9   prospective relationship—the Arizona Defendants were not aware of even the <u>existence</u> of
10  Plaintiff, let alone who he may or may not seek to do business with.  *See* Exhibit B, ¶¶ 12-17.
11  Plaintiff has no likelihood of success on this claim.

12                      4.     <u>Invasion of Privacy (Third and Fourth Causes of Action)</u>

13         Any information contained within a public record cannot, as a matter of law, be
14  considered a "private fact" that could serve as a basis for an invasion of privacy claim.
15  *Montesano v. Donrey Media Grp.*, 668 P.2d 1081, 1085 (Nev. 1983) (dismissing public disclosure
16  of private fact claim based on *Cox Broadcasting*); *Spitzmesser v. Tate Snyder Kimsey Architects, LTD.*,
17  No. 2:10-CV-01700-KJD, 2011 WL 2552606, *6 (D. Nev. June 27, 2011) (dismissing false
18  light claim based on *Cox Broadcasting*).   This rationale applies even when a substantial period
19  of time has elapsed since the public record containing the information was created.  *Franchise*
20  *Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 140 (2014), *reh'g denied* (Nov. 25, 2014), *cert. granted in*
21  *part sub nom. California Franchise Tax Bd. v. Hyatt*, 135 S. Ct. 2940 (2015) (the Nevada Supreme
22  Court "has never limited the application of the public records defense based on the length of
23  time between the public disclosure and the alleged invasion of privacy").   False light, like
24  defamation, requires at least an implicit false statement of objective fact.  *Flowers*, 310 F.3d at
25  1132.

26         As shown above, the information in the Website cannot constitute a private fact and
27  the Arizona Defendants have made no false statements of any kind.   Moreover, their

21

publications are protected and rendered immune from suit by multiple privileges and other legal doctrines.  Plaintiff has no likelihood of success on these claims.

5.     Request for Injunctive Relief (Fifth Cause of Action)

For all the reasons set forth in this Motion, Plaintiff does not have, and cannot show, that the Amended Complaint is legally sufficient or that he has a reasonable probability of success on any claim.  Although the burden is not explicitly defined, no credible argument can be made that the "reasonable probability" standard is equal to or greater than the four-prong injunction standard required by *Winter v. Natural Res. Def. Council, Inc.* (555 U.S. 7 (2008)).  Plaintiff's inability to meet even his lower burden obviates the need for any discussion of how the Plaintiff has failed to establish each of the requirements of *Winter*.  He cannot succeed in his claim for injunctive relief.

## IV.     The Arizona Defendants are entitled to their attorneys' fees and costs incurred in responding to this lawsuit.

A prevailing defendant on a motion under the Nevada anti-SLAPP statute is entitled to recover its attorneys' fees and costs. NRS § 41.670(1)(a) ("the court <u>shall</u> award reasonable costs and attorneys' fees to the person against whom the action was brought") (emphasis added). The award of attorneys' fees and costs to a defendant who successfully brings a motion under the anti-SLAPP statute is not discretionary, but mandatory. *Thomas v. Fry's Electronics, Inc.*, 400 F. 3d 1206, 1206-1207 (9th Cir. 2005); *Pfeiffer Venice Properties v. Bernard*, 123 Cal. Rptr. 2d 647, 650 (Cal. Ct. App. 2002); *see also*, *Ketchum v. Moses*, 17 P.3d 735, 740-741 (Cal. 2001) ("any SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney fees").

The purpose of the anti-SLAPP statute is promoted by construing the provision broadly, so as to permit a SLAPP defendant to recover mandatory reasonable attorneys' fees to compensate for the legal services actually provided in response to a SLAPP suit. *Dowling v. Zimmerman*, 103 Cal. Rptr. 2d 174, 194 (Cal. Ct. App. 2001). The total sum of such recovery properly reflects <u>all</u> aspects of the defensive litigation, including the fees incurred in

connection with the anti-SLAPP motion, the efforts towards the recovery of the attorneys' fees and costs under the anti-SLAPP statute, and all fees generated in the offer of alternative legal arguments. *See*, e.g., *Id.* (prevailing SLAPP defendant entitled to recover "modest" award of $9,300 in attorneys' fees to compensate for legal services in connection with both anti-SLAPP motion and the recovery of attorneys' fees and costs under anti-SLAPP statute); *see also, Metabolife Int'l, Inc. v. Wornick*, 213 F. Supp. 2d 1220, 1223-1224 (S.D. Cal. 2002) (prevailing SLAPP defendant entitled to recover fees and costs of $318,687.99 incurred for preparation of anti-SLAPP motion and assertion of alternative legal defenses in response to meritless litigation).

For example, in *Metabolife International*, the Southern District of California held that the prevailing SLAPP defendant was entitled to all of the legal fees and costs that he had incurred in retaining two firms to provide a defense against the plaintiff's SLAPP lawsuit, specifically including those expended in asserting alternative legal grounds for the dismissal of plaintiff's lawsuit, regardless of whether those arguments were ever reached by the court. *Metabolife International*, 213 F. Supp. 2d at 1223. The court further held that, because all of the causes of action against the defendant were subject to the anti-SLAPP statute, all of his attorneys' fees and costs were incurred in connection with the anti-SLAPP motion. *Id.*

Because Plaintiff's action arises from the Arizona Defendants' protected speech activities and because Plaintiff's claims are meritless, Plaintiff's suit is subject to dismissal under Nevada's anti-SLAPP statute and the Arizona Defendants are entitled to an award of all of their costs and fees incurred in this action.

## V.   The Court should Order that the additional statutory penalty authorized by Nevada's anti-SLAPP statue is warranted due to the utterly frivolous nature of Plaintiff's suit.

The Court should award the Arizona Defendants the full additional $10,000 permitted by Nev. Rev. Stat. § 41.670(1)(b). The very purpose of anti-SLAPP statutes is to ensure that citizens' free speech (and the judicial system) are not weighed down by legally-frivolous

1  lawsuits and to provide a series of remedies strong enough to deter the filing of future SLAPP

2  lawsuits.    Prior to the filing of this motion, counsel for Plaintiff was informed of the

3  immunities created by public record case law, the First Amendment, and the Communications

4  Decency Act.  Plaintiff chose to continue prosecuting the action.

5      The Ninth Circuit uses the term "frivolous" as shorthand "to denote a filing that is

6  both baseless and made without a reasonable and competent inquiry."  *Townsend v. Holman*

7  *Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990); *Bergmann v. Boyce*, 856 P.2d 560, 564 (Nev.

8  1993) (citing *Townsend*).  To say that Plaintiff's claims are frivolous is not even a close question.

9      Plaintiff's attempts to prevent access to public record disregards over at least fifty years

10  of legal precedent, stretching from coast to coast and as high as the United States Supreme

11  Court protecting that very right.  The cases showing Plaintiff's claims are meritless are not

12  obscure, one-off decisions by rogue courts that have evaded reversal merely because the issue

13  has not been revisited after the decisions were published.  Many of the cases cited in this

14  motion have defined the entire body of law they address and have substantial progeny.  No

15  reasonable argument can be made that the positions taken by Plaintiff and his counsel in this

16  matter have a basis in law or are grounded in a reasonable and competent inquiry into the

17  relevant law.  Either no such inquiry was conducted or Plaintiff filed his claims with the hope

18  neither the Arizona Defendants nor the Court would be aware of the overwhelming

19  precedent showing those claims had no merit.

20      Moreover, *G.D. v. Kenny* was decided in 2011—a year before Plaintiff ever received his

21  expungement and four years prior to filing this lawsuit.  The losing *Kenny* plaintiff's arguments

22  were <u>identical</u> to the positions taken by Plaintiff in this action related to the effects of the

23  <u>same</u> statute.  Plaintiff stands at odds with a state's highest court's construction of that same

24  state's statutes.  That such a position is unsupportable cannot even accurately be called the

25  "understatement of the century"— this legal axiom dates back more than 200 years.  *See Polk's*

26  *Lessee v. Wendal*, 13 U.S. 87, 94 (1815).  Plaintiff argues not for a change in the law, but, rather,

27  as if the issue was not definitively and unambiguously decided against him.

Nor can it be argued that Plaintiff's position has a good faith basis in Nevada law but that he was unaware of the countervailing New Jersey holding. Nevada has statutes parallel in nature to the New Jersey expungement statutes, but refer to "sealing" the records instead of "expunging" them. *See* Nev. Rev. Stat. § 179.241 *et seq.* The Nevada version contains the identical "deemed never to have occurred" phrase as the New Jersey law. Nev. Rev. Stat. § 179.285. The statutes serve identical purposes. *See Baliotis*, 102 Nev. at 1339-1340. Their failure to create a basis for false statement torts is identical—regardless of the language of the statute, "history is not erased." *Id.* at 1340. *Baliotis* predates *Kenny* by 25 years and was good law even before Plaintiff's conviction in New Jersey.

"One standard for frivolousness is risibility—if you start laughing when repeating the argument, then it's frivolous." *In re Schivo*, 462 B.R. 765, 777 (Bankr. D. Nev. 2011) (quoting *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 934 (7th Cir.1989) (en banc)). Plaintiff's case, when stripped of all nuance and distraction, rests on three premises: 1) the public does not have the right to access public records; 2) the holding of the ultimate authority on a law does not affect his ability to argue in the opposite; and 3) the laws of the U.S. Congress do not apply to him. Repeating those statements can only elicit laughter—likely of the sad variety.

An additional award is warranted in this matter because of the sheer number of legal doctrines and unambiguous court decisions that *should* have prevented Plaintiff from filing this lawsuit in the first place. In this arena of law, the public records exception, the fair reporting privilege, the Communications Decency Act, and the First Amendment are not rarely-invoked or unknown concepts—they drive the discourse. The *Kenny* decision stands directly at the crossroads of false statement torts and the New Jersey expungement statute—both issues which Plaintiff *knew* were implicated in this lawsuit. If the additional statutory penalty is present in the anti-SLAPP statute to address those lawsuits which are a *particularly* pointless waste of judicial resources and the time and money of the SLAPP defendant, it is difficult to envision a more apt circumstance than that presently before the Court. "Litigants

and attorneys in the federal courts understand the risk that they may be held accountable for their conduct in their sojourn through the judicial system, and if they fail to appreciate that risk, those Courts have the wherewithal to educate them." *Gordon*, 590 N.Y.S.2d at 657. The penalty should be leveraged against Plaintiff to the fullest extent allowable, to ensure the Nevada anti-SLAPP statutes can serve their intended purpose to discourage free-speech-inhibiting litigants from filing other meritless lawsuits.

**VI.    Conclusion**

Open and easy access to a large swath the world's information, coupled with the seemingly infinite lifespan for that information in the internet age, is forcing both governments and individuals to adjust their behaviors and expectations. The inherent downside of instantaneous access to information gathered about almost every aspect of modern society is an inevitable reduction in privacy. Events and information that in a previous era may have receded into the mists of history, can now be permanently stored, catalogued, and retrieved. While Plaintiff's desire to remove the negative information about his past is understandable, attempting to subvert free speech and the protections of the law can never be a permissible tactic to achieve it. Nor should the Arizona Defendants be forced to spend money to hire an attorney, be asked to pay Plaintiff damages, or be forced to lose their business all because Plaintiff has a criminal past. "There are some shocks, inconveniences and annoyancies [sic] which members of society in the nature of things must absorb without the right of redress." *Carlisle v. Fawcett Publications, Inc.*, 20 Cal. Rptr. 405, 415-416 (Cal. Ct. App. 1962).

For all of the reasons set forth herein, the Arizona Defendants ask this Court grant this special motion to dismiss, award them their costs and attorneys' fees incurred in this matter, and award them an additional $10,000 pursuant to the Nevada anti-SLAPP statutes due to Plaintiff's filing of this wholly meritless litigation attempting to curtail protected free speech activities.

RESPECTFULLY SUBMITTED this Friday, December 4, 2015.

/s/Michael Harnden

Michael Harnden
Counsel for the Arizona
Defendants


/s/ Bret Whipple

Bret Whipple
Counsel for the Arizona
Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2015, a copy of the foregoing was electronically transmitted to the Clerk's office for filing and served using the CM/ECF System.